(October 14, 1997)

■ TNS HOLDINGS, INC., et al., Respondents, v MKI SECURITIES CORP. et al., Appellants. [663 NYS2d 144] —Order, Supreme Court, New York County (Beatrice Shainswit, J.), entered May 22, 1996, which denied the motion of defendants MKI Securities and MAI, PLC to stay an arbitration proceeding between plaintiffs and themselves, and directed all parties to arbitration, is modified, on the law and the facts, to the extent of granting the motion to stay the arbitration as to MAI only, and otherwise affirmed.

Between 1992 and 1993, plaintiff TNS Holdings, Inc. ("TNS"), formerly known as "Tradenet, Inc.," negotiated with defendant MKI Securities Corp. ("MKI") for the sale of TNS's primary asset, a software system designed to provide on-line trading information to bond brokers known as "Tradenet." MKI, a stock and bond brokerage firm with its main offices in New York City, is a wholly owned subsidiary of defendant MAI, PLC ("MAI"), an international financial, media and information services company based in London, England. Defendant Batchnotice, PLC ("Batchnotice") is also a wholly owned subsidiary of MAI and the sister corporation of MKI.

The negotiations between TNS and MKI led to a series of agreements entered into on September 3, 1993, including a Software Purchase Agreement, a Hardware Purchase Agreement ("hardware agreement"), and a Software Licensing Agreement ("licensing agreement"). TNS also alleges an oral employment agreement was made requiring MKI to hire key

employees of TNS for five years. All the negotiations for the buyer's side were conducted by representatives of MKI. MKI was to be the sole beneficiary and user of the Tradenet software as well as the exclusive entity to market the software to third parties.

A short time before September 3, 1993, the date the hardware and licensing agreements were signed, MKI informed TNS that while MKI would execute the other agreements relating to the purchase, its subsidiary Batchnotice would execute the Software Purchase Agreement as buyer. Unlike the other agreements, the Software Purchase Agreement contained an arbitration clause stating: "For the purposes of this Agreement only, Buyer, Seller and each of the Shareholders hereby agree that all claims arising out of or relating to this Agreement shall be resolved by arbitration."

The instant dispute arose out of the alleged oral employment agreement. According to TNS, the agreement required MKI to employ Richard Zachar and George Bloukos and certain other lower level TNS employees for the five-year duration of the Software Purchase Agreement. TNS further alleges that the income earned by its employees in bond trades on behalf of MKI, and the income generated by the use of the Tradenet software or its sale to third parties, were to be used as factors in determining the final purchase price for Tradenet.

In January 1994, MKI dismissed Zachar and Bloukos. In response, plaintiffs sent a letter to defendants informing them that the dismissals rendered all the agreements, including the Software Purchase Agreement, a nullity. Plaintiffs claimed that MKI's breach of the employment agreement would result in defendants obtaining the Tradenet software for "next to nothing," because, contrary to the agreement, the efforts of the TNS employees would not be factored into the calculation of the purchase price for the Tradenet software.

Plaintiffs commenced this action, and, in July 1994, moved by order to show cause for a preliminary injunction, and a temporary restraining order to prevent defendants from using, marketing or transferring the Tradenet software. Plaintiffs asserted that the agreements were null and void because, in response to the dismissals of the TNS employees, they had rescinded the Software Purchase Agreement prior to the defendants' actual execution of that agreement on March 4, 1994. Alternatively, plaintiffs argued that the termination of the TNS employees constituted a breach of the interrelated agreements by MKI and its "alter ego" Batchnotice, making TNS' performance impossible.

Defendants opposed the motion for injunctive relief, and moved for an order staying the action and compelling arbitration between plaintiffs and "Batchnotice Limited." Defendants argued that only Batchnotice signed the Software Purchase Agreement, and that the arbitration provision in that agreement required arbitration only between plaintiffs and Batchnotice. They further asserted that no breach occurred since their was no provision in the Software Purchase Agreement for the employment of the individual plaintiffs, or for the contributions of the those plaintiffs to be used as a factor in calculating the purchase price. Therefore, according to defendants, injunctive relief was inappropriate.

The IAS Court, by order entered October 19, 1994, denied plaintiffs' motion for injunctive relief and granted defendants' motion to compel arbitration. Specifically, the court found that the dispute over the rescission and/or breach of the Software Purchase Agreement fell within the scope of the arbitration clause in that agreement, and ordered that "the *parties* are directed to proceed promptly to arbitration" (emphasis added). Given the finding of arbitrability of this dispute, the court denied the motion for a preliminary injunction and vacated the temporary restraining order.

Plaintiffs commenced an arbitration proceeding against all three defendants on April 12, 1996. Defendants MAI and MKI moved, by order to show cause signed May 7, 1996, to stay the arbitration as against them on the grounds that there was no agreement to arbitrate between TNS and MAI or MKI. In the order appealed from, the IAS Court denied the motion, stating in pertinent part: "This court, on [defendants'] application, ordered arbitration for all parties involved; it is not for defendants, 18 months later and having filed no appeal, now to challenge that order."

Defendants MAI and MKI contend that the IAS Court erred in directing them to arbitration in the absence of any agreement on their part to arbitrate. It is established law that parties to a commercial transaction will not be compelled to arbitrate in the absence of an express agreement (*see, Matter of Marlene Indus. Corp. [Carnac Textiles]*, 45 NY2d 327, 333; *Matter of Smullyan* [SIBJET S. A.], 201 AD2d 335, 335-336; CPLR 7503 [b]). An exception exists however where it is necessary to hold one corporation responsible for the acts of its subsidiary or "dummy" corporation, " 'to prevent fraud or to achieve equity' " (*Walkovszky v Carlton*, 18 NY2d 414, 417, quoting *International Aircraft Trading Co. v Manufacturers Trust Co.*, 297 NY 285, 292; *see, Matter of Sbarro Holding [Shiaw Tien Yuan]*, 91 AD2d 613, 614).

For example, where one corporation acts as an "alter ego" of a second corporation, the second may be compelled to arbitrate a dispute although it is not a signatory to any arbitration agreement which was signed by the alter ego (*see, Matter of Sbarro Holding [Shiaw Tien Yuan], supra; see also, Horsehead Indus. v Metallgesellschaft AG.*, 239 AD2d 171; *Matter of Lubin & Schlesinger [Scheinberg]*, 234 AD2d 203, *lv denied* 89 NY2d 814). The "alter ego" theory, in this context, is a variation of the principle of "piercing the corporate veil." However, New York courts, respecting the principle of independent corporate existence, will not lightly disregard the corporate form (*Port Chester Elec. Constr. Corp. v Atlas*, 40 NY2d 652). "[P]iercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury" (*Matter of Morris v New York State Dept. of Taxation & Fin.*, 82 NY2d 135, 141).

In determining the question of control, courts have considered factors such as the disregard of corporate formalities; inadequate capitalization; intermingling of funds; overlap in ownership, officers, directors and personnel; common office space or telephone numbers; the degree of discretion demonstrated by the alleged dominated corporation; whether the corporations are treated as independent profit centers; and the payment or guarantee of the corporation's debts by the dominating entity (*Freeman v Complex Computing Co.*, 119 F3d 1044 [2d Cir 1997]; *see also, Passalacqua Bldrs. v Resnick Developers S.*, 933 F2d 131, 139 [2d Cir 1991]). No one factor is dispositive (*Freeman v Complex Computing Co., supra*).

Contrary to the dissent, there is evidence in the record to establish that plaintiffs asserted their alter ego argument in the court below, and that Batchnotice indeed acted as an alter ego of MKI. The affidavits of TNS's president and its counsel, offered in their 1994 motion for injunctive relief, included the argument that Batchnotice was acting as an alter ego of MAI and MKI.

There is also ample evidence of control over Batchnotice by MKI. The negotiations regarding the sale of Tradenet to Batchnotice were conducted *exclusively* by representatives of MKI; no evidence exists that Batchnotice exercised any corporate independence or discretion; and the Tradenet software was to be used exclusively for MKI's benefit. Additionally, that Batchnotice's sole asset was the newly acquired Tradenet software, and MKI guaranteed Batchnotice's performance of its obligations,

reinforces the conclusion that Batchnotice was merely a "dummy" corporation set up to advance MKI's interests. Further, the dissent's conclusion that the IAS Court never intended to direct MAI and MKI to arbitrate is speculative, and rebutted by the IAS Court's subsequent denial of MAI's and MKI's motion to stay the arbitration.

Plaintiffs have satisfied their burden of demonstrating that MKI dominated and controlled Batchnotice's everyday operations to the extent required to pierce its corporate veil (see, *Horsehead Indus. v Metallgesellschaft AG.*, supra [parent corporation's intent to be bound by subsidiary's contract inferable from parent's extensive participation in the negotiation of the contract, and facts that subsidiary was wholly owned by parent and existed solely to further parent's business]; see also, *888 7th Ave. Assocs. Ltd. Partnership v Arlen Corp.*, 172 AD2d 445; *Freeman v Complex Computing Co.*, supra; cf., *Allen v Oberdorfer Foundries*, 192 AD2d 1077). We agree with the dissent, however, that no evidence exists that *MAI* acted as the alter ego of Batchnotice, and we modify the order to deny the motion to stay the arbitration as to MAI.

Additionally, we note that New York courts have compelled parties who have not signed an arbitration agreement to participate in arbitration proceedings between the signatories, where the issues involving the non-signatory are " 'inextricably interwoven' " with those to be arbitrated by the other parties (*PromoFone, Inc. v PCC Mgt.*, 224 AD2d 259, 260; *Berg v Dimson*, 151 AD2d 362, lv denied 75 NY2d 703). The non-signatory may be compelled to arbitrate where it is closely related to one of the signatories and is alleged to have engaged in the same improper conduct as that party (*PromoFone, Inc. v PCC Mgt.*, supra; *Berg v Dimson*, supra). Because MKI and Batchnotice were closely related, because Batchnotice's corporate form was all but ignored during the negotiations between the parties, because MKI was the entity that initiated this dispute by dismissing the Tradenet employees, and because of the other factors evincing MKI's control over Batchnotice mentioned above, MKI should also be compelled to arbitrate this dispute. Concur—Sullivan, Milonas and Mazzarelli, JJ.

Murphy, P. J., dissents in a memorandum as follows: Recognizing that entry into the arbitral arena entails the waiver of numerous protections otherwise available in a judicial forum, the courts of this State have consistently held that arbitration may not be compelled in the absence of an express agreement by the parties consenting in specified circumstances to be bound by an arbitrator's award (see, e.g.,

*Matter of Marlene Indus. Corp. [Carnac Textiles]*, 45 NY2d 327; *Schubtex, Inc. v Allen Snyder, Inc.*, 49 NY2d 1; *Alex Colman Inc. v Silverman Prods. & Textiles*, 212 AD2d 452; *Matter of Konica Corp. v Powers*, 209 AD2d 219). And, indeed, CPLR 7503 (b) provides that a party "may apply to stay arbitration on the ground that a valid agreement [to arbitrate] was not made". Defendants have made just such an application and it is not disputed that two of them—MKI Securities Corp. (hereinafter MKI) and MAI, PLC (hereinafter MAI)—are not signatories to any arbitration agreement presently before the court. Yet, although the merit of defendants' application to stay arbitration as to MKI and MAI would appear to have been syllogistically evident, their application was nonetheless denied, leading to the within appeal.

Because I believe that the challenged disposition is probably best understood simply as the product of judicial confusion and is, in any case, not legally sustainable, I respectfully dissent from the majority's vote for its affirmance.

Plaintiffs commenced the within action in July of 1994. They sought, *inter alia*, rescission of an agreement pursuant to which the corporate plaintiff, TNS Holdings, Inc. (hereinafter TNS), sold computer software to defendant Batchnotice, PLC, a subsidiary of defendant MAI and sister corporation of defendant MKI. In their complaint, plaintiffs alleged defendant MKI's breach of an oral employment agreement collateral to the software purchase agreement, and claimed that the breach of the employment agreement would have the effect of depriving them of compensation to which they would otherwise become due under the software purchase agreement. Soon after commencing the action, plaintiffs moved to preliminarily enjoin defendants from making use of the purchased software. Thereupon, defendants, pointing out that the software purchase agreement contained a broad arbitration clause requiring the buyer (Batchnotice), the seller (TNS) and the seller's individual shareholders to submit "all claims arising out of or relating to [the] agreement" to arbitration, cross-moved for an order staying the action and compelling arbitration "as between plaintiffs and Batchnotice". Agreeing with defendants that plaintiffs' claims were sufficiently related to the software purchase agreement to render them arbitrable, the motion court purported to grant defendants' cross motion. However, while the grant of the cross motion, as made by defendants, would not have required any defendant but Batchnotice, the sole defendant signatory of the software purchase agreement, to arbitrate, the court, immediately following its grant of the cross motion,

continued the decretal with language which would prove productive of confusion respecting precisely which parties were in fact being ordered into arbitration: the court directed "the *parties* \* \* \* to proceed promptly to arbitration" (emphasis added). This latter direction, although undoubtedly intended at the time of its making to do nothing more remarkable than require the parties *to the arbitration agreement* to commence arbitration of their dispute, would be interpreted by plaintiffs as ordering all of the parties *to the lawsuit* to arbitrate regardless of whether they had in fact agreed to arbitrate. Thus it was that some 18 months subsequent to the grant of defendant's cross motion, in April of 1996, all of the defendants, including MKI and MAI, were served by plaintiffs with a demand for arbitration. Defendants thereupon moved for a stay of arbitration as to MKI and MAI, noting in their papers that MKI and MAI were not signatories of the software purchase agreement and, accordingly, were not bound by its arbitration clause, and that the defendants, on their prior motion, had sought arbitration only as between plaintiffs and Batchnotice. Defendants indicated that it had been their understanding that the court, in granting their previous motion, had not granted relief differing from that which they had requested.

Defendants' motion to stay arbitration as to MKI and MAI was nonetheless denied in a brusque two sentence order in which the court stated that arbitration had been previously ordered for "all the parties involved" at defendants' request and that it was not for the defendants, never having appealed, 18 months later to challenge the propriety of the relief granted upon their motion.

Evidently, the court was confused. It is clear that defendants had never sought arbitration as between "all the parties involved", but, upon their prior motion, had sought arbitration only as between the signatories to the software purchase agreement. What is more, there was no reason for defendants to have construed the court's prior order which did, after all, purport to grant their cross motion, as directing relief so dramatically at variance with the limited relief specifically requested in that cross motion. And, this being the case, there was no reason for defendants to have earlier challenged that relief. Indeed, it was only when the plaintiffs, after 18 months, finally served their demand for arbitration upon all of the defendants, not just Batchnotice, that the problematic nature of the wording of the court's prior order became apparent, and then defendants, far from sleeping upon their rights, moved

promptly to stay arbitration as to MKI and MAI, relief which defendants believed with ample justification to be entirely consistent with what they had previously requested and the court had previously ordered.

Plaintiffs, for their part, do not seek affirmance of the order at issue denying defendants' application to stay arbitration as to MKI and MAI, for the reasons stated by the motion court. Indeed, plaintiffs concede that defendants in their 1994 cross motion did not seek arbitration as between "all the parties involved" but only as between plaintiffs and Batchnotice. Nor do plaintiffs dispute that, of the defendants, only Batchnotice signed the software purchase agreement which, as noted, is the only agreement between the parties containing an arbitration clause. Plaintiffs nevertheless maintain that the court in its 1994 order *did* direct all the parties to the lawsuit to arbitrate regardless of whether they were signatories to any arbitration agreement, and that this extraordinary direction was justified because Batchnotice was merely the alter ego of MKI and MAI.

The alter ego theory upon which plaintiffs now rely has never previously been advanced in this litigation. Indeed, it is incontestable that there was neither argument nor a record made before the motion court in support of such a theory. Nor does it seem in any measure probable, as plaintiffs suggest, that the court *sua sponte* premised her adjudication of the 1994 motion upon that ground. Certainly, the motion court's 1994 decision and order gives not the slightest indication that an alter ego theory was considered much less employed as a basis for its ruling, and, corporate veil piercing, it is fair to observe, is not an exercise that a court would perform tacitly.

Judicial disregard of the corporate form is, in fact, permitted only in those exceptional circumstances where its proponent has carried the very heavy burden of demonstrating such complete domination of one corporation by another that there is absolutely no basis for treating the corporations as distinct entities and, moreover, that to do so would result in serious inequity (*Matter of Morris v New York State Dept. of Taxation & Fin.*, 82 NY2d 135, 141; *see also, Matter of Guptill Holding Corp. v State of New York*, 33 AD2d 362, 364-365, *affd* 31 NY2d 897; *Lowendahl v Baltimore & Ohio R. R. Co.*, 247 App Div 144, 157, *affd* 272 NY 360; *American Protein Corp. v AB Volvo*, 844 F2d 56, 60, *cert denied* 488 US 852). Leaving aside the procedural irregularity of considering plaintiffs' alter ego argument on appeal when it was not raised by them previously (*see, Kennedy v European Am. Bank*, 199 AD2d 61; *Lavine v Lavine*,

127 AD2d 566; *Berman v Hertz Corp.*, 127 AD2d 809; *Matter of Puff v Jorling*, 188 AD2d 977, 981; *General Elec. Tech. Servs. Co. v Clinton*, 173 AD2d 86, *lv denied* 79 NY2d 759), plaintiffs simply have not adduced proof upon which the very strong presumption in favor of observance of the corporate form might be overcome. While it would appear that Batchnotice was a wholly-owned subsidiary of MAI, that circumstance alone does not justify treating the defendants' corporate forms as fictitious (*see, Matter of Levin-Townsend Computer Corp. [Holland]*, 29 AD2d 925). Rather, what is needed is evidence showing MAI's actual control over Batchnotice's daily business activities. Such evidence, however, is conspicuously absent from the record. Similarly absent from the record is evidence to support plaintiffs' contention that Batchnotice was a sham entity created simply to enter into the software purchase agreement.[1] Nor, even if true, does plaintiffs' undocumented assertion that the purchased computer software was Batchnotice's only asset seem probative of much. This is particularly so in light of plaintiffs' assertion, in support of their application for injunctive relief, that the very same software had been TNS's only asset. As for the nature of the relationship between MKI and Batchnotice, it is, if anything, even less clear than that between MAI and Batchnotice; for while one might infer some measure of control from MAI's ownership of Batchnotice, MKI is merely Batchnotice's sister corporation, a circumstance from which its control over Batchnotice simply cannot be inferred at all.

Moreover, even if Batchnotice could be viewed as practically indistinguishable from MKI and MAI, there would still be no basis for viewing that circumstance as productive of such inequity as would justify disregard of defendant's corporate forms. For, "While complete domination of the corporation is the key to piercing the corporate veil * * * such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required [citations omitted]. The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene [citations omitted]" (*Matter of Morris v New York State Dept. of Taxation & Fin., supra,* at 141-142).

Although plaintiffs assert that MAI and MKI used Batchnotice as a contracting party simply to shield themselves from li-

---

1. This contention, apart from being entirely conclusory, it should be noted, is vigorously disputed by defendants.

ability to plaintiffs, the assertion hardly supports an inference of inequity[2] and, in any case, is not only unsupported but demonstrably false. As plaintiffs admit, they were informed prior to executing the software purchase agreement that MKI and MAI wished to have Batchnotice execute the agreement as purchaser for tax reasons. To allay any fears plaintiffs might have had respecting Batchnotice's accountability, MAI, far from seeking to avoid liability, on September 2, 1993, gave TNS its written guarantee of Batchnotice's performance under the software purchase agreement. Manifestly, then, this is not a case in which the corporate form was employed fraudulently simply to deprive a party of a remedy. And, indeed, plaintiffs have made no showing whatsoever that any rights they may have under the software purchase agreement—an agreement that they negotiated carefully[3] and entered into knowingly with written collateral assurances—cannot be vindicated in accordance with the procedures established in that agreement for the resolution of disputes arising thereunder, namely through arbitration with the sole purchaser, Batchnotice. To the extent that plaintiffs seek rescission of the agreement and return of the software, there is no reason why such relief cannot be obtained from Batchnotice, the undisputed present holder of the software. And, to the extent that damages are sought for breach of the software purchase agreement, I should think it clear that, in the event of a default by Batchnotice in paying an award made against it in arbitration, satisfaction of the award could be compelled within the present action as a matter of course pursuant to the aforecited guarantee by MAI of Batchnotice's performance, wherein MAI agrees to "ensure that Batchnotice is able to pay its obligations to TradeNET [sic] under the agreement when due".

Given the manifest absence of any factual basis or equitable rationale for disregarding defendants' corporate forms, plaintiffs' failure until this appeal to rely upon an alter ego theory is entirely understandable. Indeed, what has made the theory appealing, so to speak, at this late juncture in the proceedings, evidently has nothing to do with the theory's

---

**2.** Indeed, as has been observed, "it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners [citations omitted]" (*Matter of Morris v New York State Dept. of Taxation & Fin., supra,* at 140).

**3.** As plaintiffs acknowledge in their brief, "In general, the main provisions of the agreement had been negotiated in prior meetings between MKI and TNS, *including a sustained discussion on the merits of including the arbitration clause. In the end the parties agreed to include the arbitration clause*" (emphasis added).

factual viability or the equities, but with the wish retrospectively to provide some legal rationale for a ruling which in its true aspect is explicable only as the product of the court's failure during apparently hurried consideration to accurately recollect and/or apprehend precisely what it had ordered some 18 months before.

Accordingly, the order of the Supreme Court, New York County (Beatrice Shainswit, J.), entered May 22, 1996, which denied defendants' motion to stay arbitration as to defendants MKI and MAI, should be reversed and the motion granted.