OPINION OF THE COURT
Bernard J. Fried, J.
Petitioners,[1] General Re Corporation and General Re Financial Products Corporation, have instituted this special proceeding to stay a demand of arbitration by two former employees, Thomas Timothy Foxe and David W. Rose, respondents. (CPLR 7503 [b].) Respondents have cross-moved to compel the requested arbitration. (CPLR 7503 [a].)
General Re Corporation (GRN), a Delaware corporation, with its principal place of business in Connecticut, is the parent company of General Re Financial Products Corporation (GRFP), also a Delaware corporation, with its principal place of business, however, in New York. GRFP was a newly formed company when it hired Foxe and Rose in March of 1990, both of whom worked without a contract until June 1, 1990, when they entered into identical two-year employment Agreements (Agreements) with GRFP.[2] Each employment Agreement also contained an “incentive compensation” provision, which *869 provided for an annual bonus, the terms of which were contained in a two-page document entitled “Profit Sharing Bonus Pool”, attached as exhibit A to each employment Agreement; this was also referred to as the Deferred Compensation Account or DCA.
On May 16, 1990, prior to execution of the employment Agreements, Ronald Anderson, who was vice-president finance of GRN and chairman of the newly formed GRFP, issued a side letter to both respondents stating that “there would be a profit sharing bonus pool for 1993 as described in Exhibit A of the * * * 1990 employment contract.” Anderson further wrote, “[w]e can’t put that in the contract or it in effect becomes a three-year contract rather than the two years we’ve agreed upon.” Anderson also stated that GRN, as the parent corporation, would “guarantee” GRFP’s obligations under each employment agreement.[3]
Beginning with the 1991 bonus,[4] each employee had the option of contributing a portion of it into a DCA. Thereafter, GRFP automatically contributed one quarter of each annual bonus to the employee’s DCA. The 1991/1992 DCAs were also made contingent on a three-year vesting schedule, at which point they became redeemable by the employee. Unredeemed funds were also eligible for annual increments, or accruals, based upon a formula tied to the company’s profitability for a period of seven years. At the end of the seven-year period, all DCA monies were to be redeemed by GRFP and paid out as cash to each employee. Thus, the DCA monies for 1991 and 1992 bonuses would be fully redeemed in 1999 and 2000, respectively. However, if the employee’s employment was terminated for cause, or if the employee, left GRFP, the vested *870 portion of the DCA would become redeemable and the non-vested portion would lapse and be forfeited.[5]
In 1992, when the employment Agreements expired, both employees became employees-at-will. This is not disputed. Thereafter, in December 1994, after the deferred portion of the 1993 bonus had been deposited into the DCA, a revised 1993 DCA plan was issued by GRFP which made minor changes to the 1993 bonus award, retroactively. The DCA account was then referred to as the “old DCA” (as contrasted to a new DCA, created in 1994, which is not at issue here). Foxe agreed to the revised DCA, but elected to receive his 1993 bonus as it became vested; the 1993 bonus was also contingent upon a three-year vesting schedule. Rose did not agree to the revised DCA. He contends that his 1993 DCA is subject to the original Agreement terms,[6] which entitled him to a seven-year bonus accrual period until the year 2002.
On October 15, 1996, Foxe’s employment was terminated. GRFP claims that the termination was for cause, allowing it to redeem the vested portion of his DCA.[7] GRFP also declined to award Foxe a bonus for 1996, and omitted the vested portion of Foxe’s DCA from the bonus accrual awards for 1996. Rose’s employment was terminated on April 10, 1997, effective May 1, 1997. GRFP contends that Rose’s employment similarly was *871 terminated for cause, and it redeemed all of Rose’s vested DCA.[8]
On or about July 23, 1997, relying upon arbitration clauses in the employment Agreements,[9] respondents, Foxe and Rose, filed a joint demand for arbitration with the American Arbitration Association in New York City, against petitioners GRN and GRFP. Five[10] claims are specified in this demand: (1) that because the employment of each respondent was wrongfully terminated, the monies in the old DCA accounts were wrongfully withheld from Foxe and released to Rose and the respondents are entitled to twice the amount of such monies, with costs and fees, under the General Statutes of Connecticut; (2) that for similar reasons, the respondents are entitled to compensatory damages for the improper liquidation of the old DCA accounts, for the failure to pay respondent Foxe his 1993 DCA, and for the improper liquidation of Rose’s 1993 DCA; (3) that the respondents are entitled to an accounting concerning the 1991, 1992 and 1993 DCA accounts; (4) that the respondents are entitled to a declaration of rights concerning these accounts; and (5) an order permitting respondents to continue to accrue their rights under these accounts, pursuant to the seven-year provision of the old DCA. Essentially, as narrowed in the briefs and at oral argument, respondents claim that they are entitled to maintain the 1991/1992 DCAs. With regard to the revised 1993 DCA: (1) Rose claims that since he did not elect to withdraw his 1993 bonus monies, they should have been deposited into, and remain a part of his old DCA account; and (2) Foxe claims that his revised 1993 DCA monies, which he had elected to withdraw as they became vested, should have been calculated in accordance with the old DCA accrual formula.
Contending that the claims relating to the old DCA are not arbitrable due to the termination of the employment Agreements, and further contending that the revised 1993 DCA was never subject to an arbitration agreement, petitioners seek to permanently stay the arbitration. On the other hand, respon *872 dents contend that because their rights under the old DCA have vested, these are arbitrable claims notwithstanding the expiration of the employment Agreements. Moreover, they argue that the claims relating to the revised 1993 DCA are arbitrable under the original employment Agreements. Therefore, respondents have cross-moved to compel arbitration and to dismiss the petition. Of course, the initial inquiry is whether there was an agreement to arbitrate.
The starting point in the analysis is the application of the fundamental principle, recently restated in Matter of Smith Barney Shearson v Sacharow (91 NY2d 39, 45 [1997] [citations omitted]), that “the question of arbitrability is an issue generally for judicial determination in the first instance”. However, respondents contend that applying the Smith Barney decision, which recognized that there is “[a]n important legal and practical exception” to this rule, when the parties themselves agree “to arbitrate arbitrability” (supra, at 46), I should conclude that the parties here had a similar intention, and that the petition to stay the demand for arbitration should be denied and leave this issue for the arbitrator. This requires an examination of the Smith Barney holding, in a case involving the National Association of Securities Dealers (NASD) Code of Arbitration Procedure (Code), that it was for the arbitrator and not the Court to decide the question of eligibility for arbitration under section 15, the Code’s timeliness provision, which “present[ed] a question of arbitrability.” (Supra, at 45.) In his opinion for the Court, Judge Bellacosa pointed out that the Smith Barney parties had agreed that “ ‘[a]ny controversy * * * shall be settled by arbitration’ in accordance with the rules of the NASD Code”. (Supra, at 43.) And because section 35 of the Code provided that “ ‘[t]he arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code’”, he concluded that the intent of the parties was “to arbitrate the issue of arbitrability [including the issue of timeliness]”. (Supra, at 46-47.) He then wrote, “[s]tated differently, ‘[t]he language of the [NASD] Code itself commits all issues, including issues of arbitrability and timeliness to the arbitrators’ ”. (Citations omitted.)
Smith Barney (supra) then leads to the query whether Rules of the American Arbitration Association (AAA), which are involved in the instant case, similarly commits the issue of arbitrability to the arbitrators. It is noteworthy that there is no AAA rule which is analogous to section 35 of the NASD Code. Rather, rule 52 of the AAA Rules provides that the “arbitrator *873 shall interpret and apply these rules insofar as they relate to the arbitrator’s powers and duties,” which are defined in rule 3 as “prescribed in the agreement of the parties and [in] these rules.” Since these Rules do not provide for the arbitrator to decide the issue of arbitrability, it is necessary to turn to the agreement itself to see if the parties agreed to submit this issue to the arbitrator. By its language, the arbitration clause at issue provides that “[i]n the event of any dispute concerning the interpretation or application of this Agreement, such dispute shall be submitted to arbitration * * * in accordance with the rules and procedures of the American Arbitration Association, in New York, New York.” This is hardly an agreement to permit the arbitrator to decide the threshold issue of arbitrability. Rather, it is an agreement that the arbitrator is empowered to decide all questions that arise “concerning the interpretation or application” of the terms of the employment Agreements. This is of course what an arbitrator would traditionally have been required to do, pre-Smith Barney. (E.g., Sisters of St. John the Baptist Providence Rest Convent v Geraghty Constructor, 67 NY2d 997, 998 [1986].) It seems to me that it would be circular reasoning to conclude otherwise and to decide that this language commits the issues of arbitrability to the arbitrator. This conclusion is buttressed by Smith Barney’s citation to Matter of Primex Intl. Corp. v Wal-Mart Stores (89 NY2d 594 [1997]), which involved AAA Rules, for “the well-settled proposition” that the threshold question of arbitrability is for the court and not the arbitrator. (91 NY2d, at 45.)
This analysis requires examination of the employment Agreements to determine whether the claims in the demand are arbitrable. Or to put it as the Primex Court wrote, “whether there is a clear, unequivocal and extant agreement to arbitrate the claims”. (89 NY2d, supra, at 598.) In this regard, it is necessary to recall that there are separate claims, i.e., those which arise out of the 1991 and 1992 DCA accounts, and those which arise out of the 1993 DCA account.
(a) 1991/1992 DCAs. The employment Agreements explicitly provided that each employee, respondents Foxe and Rose, participate in the 1991 and 1992 DCA, as set forth in an attachment, exhibit A. Furthermore, the Agreements explicitly provided for the arbitration of “any dispute concerning the interpretation or application of this Agreement.” There does not appear to be a real dispute that the claims relating to the 1991 and 1992 DCAs are arbitrable under the Agreements. Rather, it appears to be the argument that the “rights at issue” did not *874 arise during the period the Agreements were in force. Indeed, at oral argument, counsel for the petitioners stated that “if [the court is] interpreting the Primex case [supra] to say a dispute arises chronologically after the expiration of the agreement and it has to relate back to a clause in the original agreement, I’m hard pressed to disagree with you.” And I do read Primex (supra) just that way: that where the parties have manifested a clear and unequivocal intent to arbitrate their disputes under an agreement, such intention survives the termination of the agreement with regard to disputes which arise concerning the agreement. Or as the Court of Appeals put it: “Generally, a broad arbitration clause in an agreement survives and remains enforceable for the resolution of disputes arising out of that agreement subsequent to the termination thereof and the discharge of obligations thereunder, irrespective of whether the termination and discharge resulted from the natural expiration of the term of the agreement * * * a unilateral termination under a notice of cancellation provision * * * or the breach of the agreement by one of the parties”. (89 NY2d, at 598-599 [citations omitted].)
Here the arbitration clause is a broad one; it covers “any dispute concerning the interpretation of this Agreement.” The 1991 and 1992 DCAs were created in accordance with paragraph six (Incentive Compensation) of the Agreements, “as described in Exhibit ‘A’ attached hereto.” The Agreements themselves created the rights which are at issue here, namely, the 1991/1992 DCAs and the respondents’ entitlement to them under the terms of their employment Agreements. The seventh paragraph (unnumbered) of exhibit A provides the mechanism for redemption of any vested portion and the lapse of any non-vested portion of the DCA, in the event the “employment is terminated for cause,” which is defined in paragraph eight of the Agreements. It is evident that the dispute concerning the redemption turns on whether the termination for cause was proper under the Agreements. This is, of course, a dispute naturally arising out of and relating to the employment Agreements. Certainly, as this textual analysis of the Agreements themselves makes clear, the claims or disputes concerning the 1991 and 1992 DCAs are arbitrable under the arbitration clause. Further discussion is unnecessary.
(b) 1993 DCA. The 1993 DCAs were established by the May 16, 1990 side letters sent to respondents Foxe and Rose, which stated: “There will be a profit sharing bonus pool [DCA] for 1993 as described in Exhibit A of the employment contract. We *875 can’t put that in the contract or it in effect becomes a three-year contract rather than the two years we’ve agreed upon.” It would appear that this is clear evidence that petitioners did not intend that the Agreements would be extended beyond 1992. Indeed, it is not disputed that the Agreements themselves expired in 1992 and that, after the expiration, each respondent became an employee-at-will. Petitioners argue that the termination of the Agreements determines the issue, relying on the familiar principles that “a party will not be compelled to arbitrate, absent evidence that affirmatively establishes an express agreement to do so” (Matter of Metamorphosis Constr. Corp. v Glekel, 247 AD2d 231 [1st Dept 1998], citing Matter of Waldron [Goddess], 61 NY2d 181 [1984]). A principle which is not to be overridden because “New York public policy favors arbitration.” (Matter of Aerotech World Trade v Excalibur Sys., 236 AD2d 609, 611 [2d Dept 1997].)
However, respondents contend that the dispute involving the 1993 DCA is arbitrable even though the Agreements had expired, arguing: (1) because the side letter and the Agreements were “part and parcel of a single employment package” they should be treated “as one document”; and (2) because the side letter and the Agreements “were entered into around the same time, between the same parties, for the same employment purpose" and in relation to the same transaction. The claims relating to the Side Letters are inextricably interwoven with the claims based on the Employment Agreements and old DCA.” Thus, this second argument continues, “[i]t would be a waste of both the Court’s and the parties’ resources to separate these highly related claims.”
Turning first to the argument that the side letters and the Agreements be treated as one document, respondents rely upon BWA Corp. v Alltrans Express (112 AD2d 850 [1st Dept 1985]), in which the First Department restated the rule that “[i]n the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction will be read and interpreted together, it being said that they are, in the eye of the law, one instrument.” (Supra, at 852 [emphasis added].) Without considering either the effect of the merger *876 clause, which is contained in each Agreement,[11] or whether this rule requires the execution of the documents be actually contemporaneous, it is evident that “a contrary intention” was expressed. The language of the side letters (“We can’t put [the 1993 DCA] in the contract or it in effect becomes a three-year contract rather than the two years we’ve agreed upon”) makes certain that petitioners did not intend the side letters and the Agreements to be read and considered as one instrument. Thus, it is unavailing that the parties had agreed to arbitrate all disputes under the Agreements and the rule that permits arbitration of disputes after the termination of the Agreements containing an arbitration provision has no application. Since the 1993 DCA was not provided for in the Agreements, it was not a right which arose or an interest vested under the Agreements, and a dispute concerning it is not a dispute which the parties intended to resolve in the arbitration forum provided for in the Agreements.
Furthermore, the side letters being unambiguous and completely silent with regard to an agreement to arbitrate, I do not believe they can be read to have adopted or incorporated the arbitration agreement contained in the Agreements or as an agreement to arbitrate disputes concerning the 1993 DCA. As the Waldron Court stated, approvingly quoting (then) Justice Charles D. Brietel, “the threshold for clarity of agreement to arbitrate is greater than with respect to other contractual terms” (61 NY2d, supra, at 185, quoting Matter of Doughboy Indus. [Pantasote Co.], 17 AD2d 216, 219 [1st Dept 1962]), and it “must be clear, explicit and unequivocal * * * and must not depend upon implication or subtlety”. (61 NY2d, supra, at 183-184.)
Respondents’ second argument, that the 1991/1992 DCA claims and the 1993 DCA claims are so inextricably interwoven *877 so as to require resolution by arbitration is not persuasive. Since I have concluded that the petitioners did not agree to resolve disputes concerning the 1993 DCA by submission to arbitration, they cannot be compelled to do so, even for the beneficent purpose of fostering judicial economy. Absent an agreement to arbitrate a claim, it is settled that arbitration cannot be compelled. (E.g., Matter of Waldron [Goddess], supra.) While research has disclosed appellate authority compelling inclusion of an arbitrable claim in a court action, where all the claims are “ ‘inextricably bound together and should be resolved in the same forum’ ” (Brennan v A. G. Becker, Inc., 127 AD2d 951, 953 [3d Dept 1987]), and appellate authority staying an arbitration proceeding pending the outcome of a related court action (Harris v Iannaccone, 107 AD2d 429 [1st Dept 1985], affd on opn below 66 NY2d 728 [1985]), no case has been found, and none has been cited, for the converse proposition, i.e., compelling a party who had agreed to arbitrate only one claim to submit to arbitration of another claim because of the alleged interrelatedness of both claims. Although, as shown below, there are limited circumstances in which a non-signatory to an arbitration agreement has been compelled to participate in the arbitration of a claim, which is subject to arbitration between some of the parties. (See, TNS Holdings v MKI Sec. Corp., 243 AD2d 297 [1st Dept 1997].) Here, however, there was no agreement between anyone to arbitrate the 1993 DCA, and absent such an agreement this claim must be considered to be nonarbitrable and the petition to stay arbitration of it must be granted.
The final issue is whether GRN, as a nonsignatory to the Agreements can be compelled to arbitrate the claims which are arbitrable, i.e., the claims relating to the 1991/1992 DCAs. It is undisputed that GRN, the parent of the newly formed subsidiary, GRFP, did not execute either of the Agreements, and because of this, it is argued that GRN cannot be required to arbitrate these claims. However, in reliance upon PromoFone, Inc. v PCC Mgt. (224 AD2d 259 [1st Dept 1996]), respondents contend that GRN should be compelled to participate in the arbitration. In that case, petitioner, PromoFone, Inc., sought to compel arbitration in New York, and to stay California litigation brought by PCC Management, Inc., a signatory to an arbitration agreement. The stay was granted and PCC was ordered to arbitrate not only with PromoFone, but also with Falconwood, a nonsignatory to the arbitration agreement. The lower court’s order was affirmed because “the record reveal [ed] *878 that the issues in the overall dispute between the other petitioners and appellant PCC are ‘inextricably interwoven’ with the claims against non-signatory Falconwood”. (Supra, at 260; see also, Berg v Dimson, 151 AD2d 362 [1st Dept 1989], lv denied 75 NY2d 703 [1990].) Recently, in TNS Holdings (supra), this principle was applied to require a nonsignatory, subsidiary corporation (MKI), the “alter ego” of a signatory, subsidiary corporation (Batchnotice), to participate in an arbitration. TNS Holdings noted “that New York courts have compelled parties who have not signed an arbitration agreement to participate in arbitration proceedings between the signatories” (supra, at 301 [emphasis added]), quoting the PromoFone language referred to above. It went on to conclude: “Because MKI and Batchnotice were closely related, because Batchnotice’s corporate form was all but ignored during the negotiations between the parties, because MKI was the entity that initiated this dispute by dismissing the * * * employees, and because of the other factors evincing MKI’s control over Batchnotice * * * MKI should also be compelled to arbitrate this dispute.” (Supra, at 301.) (The parent of both subsidiaries, MAI, PLC, a nonsignatory, was not required to arbitrate, since there was no similar showing concerning Batchnotice and the denial of the motion to stay arbitration as to MAI, PLC was reversed.)
Applying these precedents, it seems evident that GRN, a nonsignatory, should be compelled to participate in the arbitration between the signatories concerning the 1991/1992 DC As. It is undisputed that in or about March 1990, GRFP was incorporated following negotiations between Ronald G. Anderson, then vice-president Finance, GRN, who became chairman of GRFP and Raphael Hodgson, a founder and director of GRN, who was president and chief executive officer of GRFP from March 1990 to December 1996. GRFP was formed by Anderson after he had received approval from GRN’s Board of Directors to establish GRFP as a “corporate subsidiary dedicated to participating in derivative and other financial transactions.” Respondents Foxe and Rose were then recruited, by Hodgson, to serve as officers at GRFP. Although the respondents’ employment by GRFP began on March 12, 1990, written employment contracts were not distributed until May 15, 1990, when Anderson provided them with undated draft agreements. These were not signed until June 1, 1990, when they were executed by the respondents and by Anderson, “Treasurer”, on behalf of GRFP. Prior to the execution of the Agreements, as Anderson *879 wrote in his affidavit, the respondents “requested that GRFP’s parent corporation, General Re Corporation (‘GRN’), be a signatory to the employment agreements.” Although he rejected these requests, Anderson sent each respondent the May 16th “side letter”, on “General Re Inter Office Memorandum” letterhead, in which he wrote: “Credit Worthiness of GRFP. GRFP is the employer and that’s the entity which must be a party to the employment contract. General Re Corp. [GRN], the holding company, will guarantee (in some form) the obligations of GRFP, including swaps and the obligations of GRFP under these employment contracts.” (Emphasis in original.)
The employment Agreements expired on February 29, 1992. As set forth in the affidavit of Zoe P. Hopkins, Esq., vice-president and assistant general counsel,[12] General Re Insurance Corporation, a related GRN Corporation, as of March 1, 1992, respondents were considered at-will employees of petitioner GRFP.[13] The same affidavit explains that the decision by Hodgson to terminate respondent Foxe’s employment “was also reviewed with Petitioner GRN’s Chief Financial Officer Joseph Brandon and Theron Hoffman, Vice President of Human Resources for Petitioner GRN. It was also stated that Petitioner GRN refrained from exercising its right to consider respondent Foxe’s stock option grants to be forfeited.” Hodgson, in his affidavit, added that the termination recommendation “was also reviewed with Richard Murphy, Vice President in the General Re Corporation Law Department. Each of these individuals concurred in the decision to terminate Mr. Foxe’s employment immediately.”
Regarding respondent Rose, whose employment was terminated on April 10, 1997, effective May 1, 1997, the petition contains his February 21, 1995 annual performance evaluation, which was written on a form entitled “General Re Appraisal of Performance,” by Hodgson, “Position: V.P. Head of Structuring, Division/Dept.: GRFP.” Moreover, the Hopkins affidavit states that on April 29,1997, “GRN advised Respondent Rose by letter that his vested DCA balance had been deposited directly into his checking account by wire transfer,” and that *880 on May 21, 1997 she had “informed Respondent Rose that ‘[a]s your employment with the Company was terminated for cause, your vested DCA account was redeemed by the Company and will not be reactivated.’ ” Since there is no allegation that Rose had ever been employed by General Reinsurance Corporation, one of GRN’s related companies, Hopkins’ references must be to her capacity as employee relations manager, Human Resources Division, GRN. This is evidenced by the attachment to her affidavit of the acknowledgment, signed by Rose in 1993, acknowledging that he had “received the General Re Employee Handbook,” which Handbook welcomed Rose to GRN and listed the various companies, including GRFP, which comprised GRN.
Obviously, GRN and GRFP are “closely related” entities, and were both involved in the negotiations that led up to the execution of the Agreements which established the 1991/1992 DCA. The petitioners’ own affidavits and exhibits illustrate the fact that both GRN and GRFP had inextricably interwoven interests in the employment and the termination of the employment of respondents, Foxe and Rose, including the effect of the terminations upon the 1991/1992 DCAs. Inevitably, and ineluctably these are the issues central to the arbitration between GRFP and the respondents, Foxe and Rose. Moreover, GRN explicitly wrote to each respondent that it would “guarantee (in some form) the obligations of GRFP, including swaps and the obligations of GRFP under these employment contracts.” Certainly, GRN is more than a nonsignatory surety or guarantor of payment, which cannot be compelled to arbitrate. (Cf., Matter of National Recreational Prods. [Gans], 46 AD2d 618 [1st Dept 1974]; see also, Matter of Cosmopolitan Mut. Ins. Co. [Encarnacion], 59 AD2d 669 [1st Dept 1977].) Rather, GRN was an integral participant in the events underlying the arbitrable dispute, had agreed to ensure GRFP’s obligations under the employment Agreements, which was not limited to a financial guarantee, and therefore, even though a nonsignatory to the Agreements, which contained the arbitration requirement, should be also compelled to arbitrate this dispute.
With regard to the request that I not only stay the arbitration, but that I enter a declaratory judgment “specifying the rights and other legal relations between the parties,” such request is denied. Here petitioners chose to proceed by way of a special proceeding brought under CPLR article 75, “Application to stay arbitration.” They could have chosen to proceed to also file a declaratory judgment action under CPLR 3001. They *881 chose not to do so, but rather to include the request for a declaratory judgment in the article 75 petition. This is impermissible (see, Matter of Allstate Ins. Co. v Olsen, 222 AD2d 579 [2d Dept 1995]), since an action for a declaratory judgment is separate and distinct from a special proceeding. (Cf., 873 Third Ave. Corp. v 875 Third Assocs., 87 AD2d 518 [1st Dept 1982].) Therefore, the portion of the petition which requests a declaratory judgment must be dismissed.
Accordingly, for the foregoing reasons, the petition to stay arbitration is granted to the extent that the arbitration of all claims relating to the 1993 DCAs is stayed; however, the portion of the petition which seeks to stay arbitration of all claims relating to the 1991/1992 DCAs is denied. That portion of the petition which seeks a declaratory judgment is dismissed. Respondents’ cross motion which seeks to compel arbitration is granted to the extent that arbitration is compelled of all claims relating to the 1991/1992 DCAs; however, the portion of the cross motion which seeks to compel arbitration of all claims relating to the 1993 DCAs is denied. Finally, petitioner GRN is ordered to participate in the arbitration regarding the 1991/ 1992 DCAs.[14]

. By stipulation, the respondents have agreed to dismiss, with prejudice, petitioners General Re Corporate Finance, Inc., and General Re Securities Corporation from the demand for arbitration. Therefore, the caption has been amended to delete these parties.

. The term of the Agreements was from March 12, 1990 to February 29, 1992. At the end of the two-year term, both employees concededly became employees-at-will.

. The side letter was sent, as Anderson wrote, because “[t]here are further understandings with General Re Corporation regarding your terms of employment. As you know, some of these points cannot easily be put into the form of a contract and agreed upon by lawyers. I have put them in the form of this signed ‘side letter,’ so that they are binding upon General Re.” In addition to providing for the 1993 DCA, the side letter also contained a statement that General Re Corp., the holding company of GRFP, will “guarantee (in some form) the obligations of GRFP, including swaps and the obligations of GRFP under these employment contracts.”

. Each annual bonus was paid the following year, i.e., the 1991 bonus was paid in 1992.

. Exhibit A provided: “If employment is terminated by GRFP for cause * * * or by the participant, any nonvested DCA remaining unredeemed at that time shall permanently lapse, the vested amount of the DCA shall become redeemable.”

. The original “Profit Sharing Bonus Pool”: “Awards for * * * subsequent years will be paid * * * 25% in the form of a deferred compensation account * * * If at the expiration of the employment agreement or at any time within two years following such expiration, of [sic] the company fails to offer the participant continuing employment on terms substantially similar to those set forth in the agreement, then all remaining DCA shall become redeemable * * * Any DCA remaining unredeemed on the seventh anniversary of their award will automatically be redeemed as of that date.”

. It is not disputed that Foxe’s rights to the 1991 and 1992 DCA amounts under the employment Agreements were vested. It is also not disputed that Foxe elected to receive the 1993 bonus award as it became vested; one third on March 1, 1995, one third on March 1, 1996, and one third on March 1, 1997. What is disputed is whether Foxe’s March 1, 1997 portion of the 1993 bonus is forfeited by virtue of his employment being terminated. Additionally, Foxe disputes whether the 1993 bonus award should be calculated under the revised DCA plan, despite his consent to the revised DCA plan.

. It is not disputed that Rose’s DCA awards for 1991, 1992 and 1993 were vested.

. The Agreement provided: “Resolution of Disputes. In event of any dispute concerning the interpretation or application of this Agreement, such dispute shall he submitted to arbitration on an expedited basis before a single arbitrator in accordance with the rules and procedures of the American Arbitration Association in New York”.

. The demand refers to a sixth claim; however, due to an apparent topographical error, it does not contain a sixth claim.

. The “merger” clause provides: “This agreement supercedes any prior agreements, written or oral, and any working arrangements between the parties.” It is argued by petitioners that the inclusion of this clause in the Agreements, which were executed on June 1, 1990, two weeks after the May 16, 1990 side letter, bars application of the arbitration clause with respect to the 1993 DCA established in the side letter. Respondents, on the other hand, contend that the merger clause doctrine does not apply because even though the Agreements were executed on June 1st, they were actually provided to the respondents on May 15, 1990, and it was on the following day, May 16th, that the side letters were issued to them. Thus, since the side letters were not “prior agreements” barred by the language of the merger clause, the side letters survive and stand alongside the Agreements. It is not necessary to reach this issue in light of my conclusion that the 1993 DCA dispute is not arbitrable under the Agreements.

. Although Ms. Hopkins describes herself as “Vice President and Assistant General Counsel with General Reinsurance Corporation,” in the Employee Handbook Acknowledgment signed on December 12, 1993 (exhibit 9 to the petition), she is described as “Employee Relations Manager, Human Resources Division” of GRN.

. Excerpts from petitioner GRN’s fall 1993 Employee Handbook Acknowledgment, attached to the petition as exhibit 9, confirms the at-will nature of respondents’ employment.

. Petitioners’ request to seal “all documents filed in connection with this special proceeding” is denied. I do not find “good cause” warranting such relief. (See, Uniform Rules for Trial Cts [22 NYCRR] § 216.1 [a].)