OPINION OF THE COURT
Mazzarelli, J.E
The defendants in this action, other than defendant Tap Automotive Holdings, LLP are a group of lenders* (the Senior Lenders) that extended loans, primarily via a “Senior Secured Credit Facility,” to nonparty Tap Operating Company, LLC (Tap), in connection with Tap’s acquisition of an automotive • company. The arrangement provided, among other things, for the Senior Lenders to take a security interest in substantially all of Tap’s assets. In addition, plaintiff Tap Holdings, LLC (Holdings) granted to the Senior Lenders a security interest in 100% of its Tap membership units. Holdings is alleged to own 100% of Tap and made a substantial investment in the acquisition. Holdings is in turn substantially owned by the three “Irving Place Capital” plaintiffs as well as plaintiff The BSC Employee Fund VII, L.E (collectively IPC). In addition to the credit facility and the equity investments, the acquisition was financed by Tap’s issuance of senior subordinated notes, the rights under which have been assigned to plaintiff IPC Manager II, LLC (Manager). Manager is the only plaintiff seeking relief under the eighth cause of action at issue herein.
Plaintiffs allege that Tap never defaulted on its payments to the Senior Lenders, but that it did violate certain “technical” covenants. Instead of declaring Tap in breach of the entire arrangement based on those violations, the Senior Lenders and Tap entered into a series of forbearance agreements pursuant to which, in exchange for additional equity infusions by IPC, the former agreed not to exercise their rights to seek payment of the full loan amount or to enforce their security interests. At the expiration of the final forbearance agreement, however, the Senior Lenders refused to enter into a new one, leading to Tap’s defaulting on certain obligations related to the automotive business and to the Senior Lenders’ alleged refusal to permit Tap to make payments to holders of the subordinated notes. The Senior Lenders did agree, as a condition of avoiding default under the credit facility, to enter into a “Participation Agreement” with IPC. Pursuant to that agreement, IPC guaranteed $7 million of *171 Tap’s obligations to the Senior Lenders on a “last out” basis, meaning that any loans still outstanding and owing to the Senior Lenders under the credit facility would have to be paid, up to $7 million, before IPC would receive any payments for their contributions to Tap. Following that arrangement, the Senior Lenders granted additional forbearance periods while the parties attempted to restructure the financing. However, negotiations failed to bear fruit, and the Senior Lenders refused a final forbearance. Instead, it is alleged that the Senior Lenders exercised their security interests in Holdings’ membership units in Tap, terminating Holdings’ voting rights and replacing the entire board of Tap, save one person. Tap and Holdings advised the Senior Lenders that their actions were ineffective under both Delaware law and Tap’s operating agreement because Holdings, as sole member, did not have any presently exercisable right to remove the members of Tap’s board, and the Senior Lenders could have no greater rights than Holdings. It is further alleged that, in response, the Senior Lenders simply amended Tap’s operating agreement to allow for the removal of members of the board at any time, with or without cause, removal of all existing board members except the one the Senior Lenders had elected to keep, and to specifically allow the appointment of two new members.
A few months later, citing Tap’s defaults under the credit facility, the Senior Lenders accelerated payment of $7 million in loans, triggering IPG’s obligation under the Participation Agreement. After IPC made the payment, the Senior Lenders withdrew the acceleration and Tap continued in business. Plaintiffs allege that Tap’s financial condition improved dramatically thereafter. Nevertheless, under the constructive control of the Senior Lenders, Tap entered into a “Foreclosure Agreement” with the Senior Lenders which provided that (1) Tap would transfer all its assets (and those of its subsidiaries) to a newly formed entity, controlled by the Senior Lenders, to be named defendant Tap Automotive Holdings, LLC (New Tap); (2) New Tap would assume all liabilities either incurred by Tap in the ordinary course of business or specifically agreed to in the Foreclosure Agreement; (3) New Tap would employ all employees of Tap on substantially similar terms; and (4) New Tap would fund the wind-up and dissolution of Tap. Pursuant to this arrangement, New Tap acquired Tap’s assets for $66 million, via Tap’s issuance of a new note. This amount covered the Senior Lenders’ outstanding loans (minus the $7 million owed *172 to IPC by reason of their loan purchase pursuant to the Participation Agreement), and left nothing for the holders of Tap’s subordinated debt or equity. Indeed, at the time of the transaction, Tap still carried approximately $38 million worth of subordinated indebtedness, including interest. New Tap did not assume responsibility for the subordinated notes. However, as alleged by plaintiffs, New Tap was no different than Tap, using the same trade names, physical assets and website. Further, Tap executives assumed the same positions with New Tap, and received equity in New Tap equivalent to or in excess of their equity in Tap, which they held through Holdings.
Plaintiffs demanded that Tap bring claims against the Senior Lenders for rendering Tap insolvent, but the demand was refused. Accordingly, plaintiffs themselves commenced this action, naming Tap as a nominal defendant, and seeking to recover on the subordinated notes and the participation interests, and to have the transferred assets returned to Tap. Tap moved to dismiss the claims against it, and the court granted the motion, finding that plaintiffs had no standing to assert derivative claims on behalf of Tap and that plaintiffs failed to show that Tap’s refusal to institute litigation was unjustified.
Plaintiffs then filed a second amended complaint, which did not name Tap, but which included the eighth cause of action at issue on this appeal. That cause of action alleged that, after the transfer of Tap’s assets to New Tap, “New Tap’s management, personnel, physical location, good will, web domain, phone number, and general business operation, etc. were (and remain) all the same.” It further asserted that: (1) the transaction “was specifically structured with the intention to shear Tap of its assets while leaving it with its liability to the Subordinated Note-holders, even though the Tap business continued as a going concern in a seamless manner”; (2) “New Tap has engaged in a defacto merger with Tap, and exists as a mere continuation of Tap and its subsidiaries”; (3) “Senior Lenders formed New Tap solely for the purpose of receiving the assets and business of Tap”; and (4) “[a]s a result, New Tap, as the successor to Tap, and the Senior Lenders, as New Tap’s alter ego, are each jointly and severally liable for all obligations and amounts owed by Tap and its subsidiaries to the Subordinated Noteholders on the Subordinated Notes.”
Both New Tap and the Senior Lenders moved to dismiss the eighth cause of action, arguing that it was precluded by the doctrine of res judicata and waiver, and by Manager’s failure to *173 adequately plead alter ego and successor liability claims. The res judicata defense was based on New Tap’s position that the successor liability claim against it depended on a finding that Tap was liable on the subordinated notes, which they argued had been decided on the merits by Tap’s dismissal from the action. They argued further that Manager’s failure to raise successor liability in the earlier complaints precluded them from raising it in the new complaint. The Senior Lenders also relied on a provision in a subordination agreement which provided that
“the holders of Subordinated Indebtedness waive any right to . . . challenge the appropriateness of any action the Senior Agent and Senior [Lenders] take with respect to the Senior Debt and hereby consent to the Senior Agent and Senior [Lenders] exercising or not exercising such rights and remedies as if no other debt existed.”
Finally, the Senior Lenders argued that Manager failed to adequately plead alter ego liability.
The court denied both motions in their entirety (2012 NY Slip Op 33205[U] [2012]). It found that Tap’s dismissal was not on the merits of any claim against New Tap, and was preclusive only on the issue of Manager’s derivative standing to assert claims on behalf of Tap. The court found further that the successor claim was substantially similar to plaintiffs’ previous claims against New Tap and thus could not form the basis of any surprise to defendants which would otherwise preclude the claim. The court rejected New Tap’s argument that the successor claim failed to state a claim for recovery against it, finding that Manager had sufficiently alleged three alternative theories for the imposition of successor liability, to wit, “mere continuation,” de facto merger and fraudulent transfer.
The court also rejected the Senior Lenders’ arguments that Manager did not adequately allege alter ego liability, finding the issue resolved by a previous determination that such claims presented fact issues that could not be resolved on a motion to dismiss. Finally, the court rejected the Senior Lenders’ argument that the successor claim was barred by the waiver provision in the subordination agreement, finding the provision inapplicable because Manager asserted intentional and bad faith misconduct, which could not be waived.
To the extent that defendants have moved pursuant to CPLR 3211 (a) (7), we address only the pleading itself, keeping in *174 mind that the motion should be denied if the facts alleged by Manager fit within any cognizable legal theory (see Leon v Martinez, 84 NY2d 83, 87-88 [1994]). Further, we must afford the pleading a liberal construction, accept the facts as alleged as true, and accord Manager the benefit of every possible favorable inference (id.).
To make out a cause of action for liability on the theory of piercing the corporate veil because the corporation at issue is the defendant’s alter ego, the complaining party must, above all, establish that the owners of the entity, through their domination of it, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against the party asserting the claim such that a court in equity will intervene (see ABN AMRO Bank, N.V. v MBIA Inc., 17 NY3d 208, 229 [2011]). Piercing of the corporate veil is not a cause of action independent of that against the corporation; it is established when the facts and circumstances compel a court to impose the corporate obligation on its owners, who are otherwise shielded from liability (Matter of Morris v New York State Dept, of Taxation & Fin., 82 NY2d 135, 141 [1993]). “Because a decision whether to pierce the corporate veil in a given instance will necessarily depend on the attendant facts and equities, the New York cases may not be reduced to definitive rules governing the varying circumstances when the power may be exercised” (id.). Indeed, this Court has observed:
“In determining the question of control, courts have considered factors such as the disregard of corporate formalities; inadequate capitalization; intermingling of funds; overlap in ownership, officers, directors and personnel; common office space or telephone numbers; the degree of discretion demonstrated by the alleged dominated corporation; whether the corporations are treated as independent profit centers; and the payment or guarantee of the corporation’s debts by the dominating entity . . . [n]o one factor is dispositive” (TNS Holdings v MKI Sec. Corp., 243 AD2d 297, 300 [1st Dept 1997], revd on other grounds 92 NY2d 335 [1998]).
The Senior Lenders insist that Delaware law applies in this case; however, the standard is not materially different under Delaware law, which has been interpreted as providing that “no single factor could justify a decision to disregard the corporate entity, [rather,] some combination of them [i]s required, and *175 ... an overall element of injustice or unfairness must always be present, as well” (see Harco Natl. Ins. Co. v Green Farms, Inc., 1989 WL 110537, *5, 1989 Del Ch LEXIS 114, *12 [1989] [citation and internal quotation marks omitted]). Under Delaware law, “the standard may be restated as: ‘whether [the two entities] operated as a single economic entity such that it would be inequitable for [a] [c]ourt to uphold a legal distinction between them’ ” (Harper v Delaware Val. Broadcasters, Inc., 743 F Supp 1076, 1085 [D Del 1990], affd 932 F2d 959 [3d Cir 1991]).
Here, constrained as we are by the allegations contained in the pleadings, we find that Manager has asserted sufficient facts to state a cause of action based on piercing the corporate veil. The second amended complaint plainly and specifically alleges that the Senior Lenders, in a scheme engineered for the sole purpose of extinguishing the note holders’ claims against the subordinated notes, and aided by their having obtained all of the voting rights of Tap, established one corporation, New Tap, in order to siphon off the funds belonging to another, Tap. The pleading can reasonably be interpreted as asserting that there was no legitimate business purpose for setting up New Tap, and that the establishment of New Tap was simply a sham intended to cut off the note holders’ ability to collect.
That it was Tap, and not New Tap, that was left in an undercapitalized state is not in dispute, but in our view that fact is irrelevant. Indeed, that argument by the Senior Lenders is indicative of their insistence that alter ego liability only exists under precise and technical circumstances. To the contrary, such liability exists when any abuse of the corporate form is exercised for the purpose of working an inequity on another (Matter of Morris, 82 NY2d at 141). The mere fact that New Tap continues to operate as a legitimate automotive business should not relieve the Senior Lenders of liability when they are alleged to have caused the creation of the entity specifically to harm the note holders. Further, we reject the Senior Lenders’ argument that Manager failed to allege sufficient facts to pierce the veil of non-party TAPL, LLC, which the Senior Lenders formed in connection with the foreclosure of Tap. The second amended complaint adequately alleges that the formation of that entity was just another element of the Senior Lenders’ scheme.
We further hold that Manager has adequately alleged a successor liability claim as against New Tap under three of the exceptions to the general rule that a corporation that acquires *176 another’s assets is not liable for the other’s torts (see Schumacher v Richards Shear Co., 59 NY2d 239, 244-245 [1983]). The first exception they identify falls under the “mere continuation” doctrine, and is based on New Tap’s having acquired Tap’s “business location, employees, management and goodwill” (see NTL Capital, LLC v Right Track Rec., LLC, 73 AD3d 410, 411 [1st Dept 2010]). New Tap contends that no mere continuation claim can exist because Tap still exists, albeit in some meager form. However, New Tap has failed to account for the fact that Manager alleges that Tap’s sole employee is a “dissolution officer,” and that Tap is no longer in good standing in Delaware for having failed to pay a tax assessment. It can reasonably be inferred from those allegations, for purposes of a section 3211 (a) (7) motion, that Tap has been effectively extinguished for purposes of application of the doctrine.
Manager adequately alleges another exception to the general rule of successor liability, de facto merger, by asserting that the ordinary business of Tap ceased and that Tap was dissolved as soon as possible, that New Tap assumed “the liabilities ordinarily necessary for the uninterrupted continuation of [Tap’s] business,” and that there was “continuity of management, personnel, physical location, assets and general business operation” (see Fitzgerald v Fahnestock & Co., 286 AD2d 573, 574-575 [1st Dept 2001]). Further, assuming that continuity of ownership is a necessary element of de facto merger, we reject New Tap’s reliance on the fact that its executives derived their interest in Tap through Holdings, and not Tap itself. After all, the question whether a de facto merger exists is “analyzed in a flexible manner that disregards mere questions of form and asks whether, in substance, ‘it was the intent of [the successor] to absorb and continue the operation of [the predecessor]’ ” (Nettis v Levitt, 241 F3d 186, 194 [2d Cir 2001], overruled on other grounds by Slayton v American Exp. Co., 460 F3d 215 [2d Cir 2006]).
Finally, Manager sufficiently alleges a fraudulent transfer (see Schumacher, 59 NY2d at 245). The complaint does not merely assert that Tap was insolvent at the time of the allegedly fraudulent transfers. Rather, it asserts that Tap was rendered insolvent by defendants’ actions. That allegation takes this case out of the purview of Ultramar Energy v Chase Manhattan Bank (191 AD2d 86 [1st Dept 1993] [reiterating the rule that “(e)ven though insolvent, a debtor may properly assign assets to a creditor as security for an antecedent debt al *177 though the effect of the transfer will be to prefer that creditor”]), on which defendants rely.
The doctrine of res judicata does not preclude the successor liability claim since the prior dismissal was premised on lack of standing to bring a derivative claim on behalf of Tap, and not on the relevant merits. Manager correctly argues that, to the extent the previous decision was on the merits, such merits extend only to the propriety of the derivative action, and not to the propriety of any action actually taken by Tap. Thus, while Tap’s decision to deny plaintiffs’ demand to take action against New Tap was protected by the business judgment rule, no other decision made by Tap is shielded from the purview of the courts. Further, this Court has held that “[a] dismissal premised on lack of standing is not a dismissal on the merits for res judicata purposes” (Tico, Inc. v Borrok, 57 AD3d 302 [1st Dept 2008]).
Moreover, contrary to New Tap’s argument, advanced to circumvent the rule that res judicata principles do not apply when the two determinations are made in the same action (see Moezinia v Damaghi, 152 AD2d 453, 457 [1st Dept 1989]), the dismissal of the derivative claims against Tap did not operate as a severance, creating a new action. New Tap cites no legal authority for the unwieldy proposition that the dismissal of a claim or a party from an action results in a new action separate and apart from the “old” action.
The Senior Lenders’ argument that the successor liability/ alter ego claim is precluded by the waiver contained in the subordination agreement is without merit. Where, as here, intentional misconduct is alleged, there can be no waiver (see Banc of Am. Sec. LLC v Solow Bldg. Co. II, L.L.C., 47 AD3d 239, 244 [1st Dept 2007]). Further, the second amended complaint can reasonably be read as alleging that defendants’ actions had no legitimate business interest and were instead taken in bad faith and calculated solely to circumvent any obligation to pay back the note holders. Accordingly, at this point the Senior Lenders’ reliance on Devash LLC v German Am. Capital Corp. (104 AD3d 71 [1st Dept 2013]), in which the defendants did act in furtherance of a legitimate business interest, is unavailing.
Finally, we reject New Tap’s request that, if we sustain the eighth cause of action, we declare that Manager’s damages are limited to the amount, if any, by which the value of the secured assets of Tap prior to their transfer to New Tap exceeded the value paid by the Senior Lenders for those assets. New Tap *178 claims that this would be consistent with the IAS court’s previous directive limiting damages on plaintiffs’ claim pursuant to the Delaware Uniform Fraudulent Transfer Act. However, New Tap has cited no authority holding that the remedies under that statute and under a common law successor liability claim are identical in all circumstances.
The eighth cause of action, viewed in the context of all the other allegations in the second amended complaint, unquestionably paints a picture of complex machinations carried out by defendants with the singular goal of shirking the obligation to make payments on the notes which were assigned to Manager. Under the standard of review governing motions to dismiss pursuant to CPLR 3211 (a) (7), that is sufficient to state a claim for successor and alter ego liability. Because these claims were not decided on the merits when Tap was dismissed from the case, it was perfectly proper for the IAS court to permit them to go forward.
Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered April 12, 2012, which denied the motion by defendant Tap Automotive Holdings, LLC and the motion by the Senior Lenders to dismiss the eighth cause of action in the second amended complaint for failure to state a claim and on the ground of res judicata, should be affirmed, without costs.
Saxe, Moskowitz and Manzanet-Daniels, JJ., concur.
Order, Supreme Court, New York County, entered April 12, 2012, affirmed, without costs.

 Defendant Orix Finance Corp. also acted as administrative agent for the Senior Lenders.